Jonathan HOLDEEN, Plaintiff-Appellant,

v.

Riley J. RATTERREE, as Late District Director of Internal Revenue, and Fulton D. Fields, as Late Acting Director of Internal Revenue, Defendants-Appellees.

No. 274, Docket 25428.

United States Court of Appeals
Second Circuit.

Argued April 14, 1959.

Decided Oct. 2, 1959.

Swan, Circuit Judge, dissented in part.

Jonathan Holdeen, in pro. per.

Myron C. Baum, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, L. W. Post and David R. Frazer, Attorneys, Department of Justice, Washington, D. C. and Theodore F. Bowes, U. S. Atty., Syracuse, N. Y., on the brief), for defendants-appellees.

Before CLARK, Chief Judge, and SWAN and MOORE, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

Plaintiff-appellant, Jonathan Holdeen, brought suit against Riley J. Ratterree, as Late District Director and Fulton D. Fields, as Late Acting Director of Internal Revenue (usually referred to as the "government"), to recover amounts which he claimed had been wrongfully and illegally collected as taxes on his income for the calendar year 1945. In the ninety-day letter containing a statement of determination of deficiency, the Commissioner gave as one reason for the

additional tax that, with respect to "ordinary income and net capital gains alleged to have been permanently set aside for charitable purposes," the gifts in trust were "void ab initio by reason of the period of accumulations provided for in the trust instruments." In most of the trusts, the period of accumulation was one thousand years. In two, it was for a much briefer period, namely, five hundred years. The second reason asserted for the imposition of the additional tax was that the purportedly distributable income was taxable to plaintiff "by reason of the ownership and control of the trust corpus retained by him after such transfers in trust." By letter dated February 24, 1958, the district director rejected plaintiff's claim for refund of $111,962.64 of income tax paid on his 1945 year liability "because income from these purported trusts for the year 1945 is taxable to the grantor under Section 22(a), Section 166 and Section 3814 of the Internal Revenue Code of 1939 [26 U.S.C.A. §§ 22(a), 166, 3814]."

Upon the trial to recover the tax paid and after plaintiff had submitted his proof, the government moved for a directed verdict upon the pleadings and the proof and also for a dismissal for failure to prove a case. The court reserved decision. At the end of the defendants' case, the government renewed its motion for a directed verdict. Plaintiff also made a similar motion. Decision was reserved on both motions.

Plaintiff and counsel for the government submitted various special interrogatories for the jury, and plaintiff moved, in the alternative, to send the case to the jury for a general verdict. The trial court denied all requests, but did submit to the jury a special question, namely, "Did Jonathan Holdeen possess such control over the property of the trusts mentioned. below so that he be considered as substantially the owner of the trust properties for income tax purposes?" Around this question he built up a rather lengthy charge in which he pointed out the various elements to be considered by the jury in answering the question. The substance of his charge was that no one element was decisive, that the evidence was undisputed, and that the jury's real function was to draw from the evidence such inferences as would enable them to answer the question posed. Specifically, he said: "What does that evidence lead you to infer? Does it lead you, a proper inference leads (sic) you to the fact that he did exercise control so as to amount to substantial ownership, or does it lead you to the fact that he did not exercise substantial control that leads to ownership. That is all there is to this case." A chart was then submitted to the jury so that it could in writing indicate as to each of the trusts involved whether its answer was "yes" or "no." The jury struggled with this question far into the early hours of the morning and answered "yes" as to six of the seven trusts (Exhibits C, 4, N, 7, 8, and 5) and as to Exhibit 6, "no." The jury was then excused in order that court and counsel could "find out just a little bit more in regard to just what this verdict means." The motions for a directed verdict had not yet been disposed of. The government then moved to set aside what it referred to as "that portion of the verdict" with respect to Exhibit 6, the trust as to which the jury had answered that the plaintiff had not retained substantial ownership. Plaintiff moved to set aside the portion of the verdict adverse to him. Decision on these motions was reserved. Thereafter, the court in an opinion (D.C., 166 F.Supp. 694, 700) disposed of all motions by denying plaintiff's motion to set aside the "special verdict of the jury" and granting defendants' motion to set aside the verdict as to Exhibit 6. The court gave as his reason for overturning the jury's "verdict" as to the one trust the circumstance that since "there was no attempt made to separate the activities of the settlor as to that trust from the others, no sound reason appears which would justify a different result." The court was not too certain as to what the jury might have considered in reaching its conclusion and indulged in some needless self-criticism as

to its charge. The findings of the jury as to Exhibits C, 4, N, 7, 8, and 5, were adopted and the finding as to Exhibit 6 set aside, the court substituting its own finding that plaintiff did exercise such control over the trust property that he should be considered as substantially the owner thereof. The conclusion was that plaintiff had failed to sustain his burden of proving otherwise; the motions to set aside the verdict were decided as outlined above; defendants' motion for a directed verdict was granted and judgment dismissing the complaint was entered.

In summary, upon this rather complicated procedural background, it would appear that the court received the answer by the jury to his question, accepted it in part and rejected it in part, and thereafter granted the motions for a directed verdict, on which decision had been reserved, in favor of defendants. From the judgment entered thereon plaintiff appeals.

Plaintiff, a lawyer by profession but primarily engaged in business activities since 1943, has a large family which he frequently refers to as "our clan." His family consists (as of the date of the trial) of his wife, ten children, including an adopted son and a foster child, and twenty-five grandchildren. He has been intensely interested in the effect of accumulation of income and the compound interest table. His writings reflect this interest in his books, "Cult of the Clan" and "Futurite Cult." He is somewhat more practical than the economist who would speculate on the present value of one cent invested at the time of Moses. A sentence from one of his books advises that one cent today invested at four per cent interest for one thousand years will become one thousand trillion dollars. Considering the fact that the money invested in only one of the trusts involved if kept invested at compound interest for one thousand years "would amount to all of the total value of the world," the trial court's wonderment as to how "two of them [the trusts] could be carried out when there is only one world" can easily

be understood and shared even in this day of space exploration. Possibly other worlds will have to be discovered for plaintiff's future investments. Although plaintiff modeled his plan somewhat after that of the thrifty Benjamin Franklin who limited himself to two hundred years (1790–1990), he was not too sanguine that his trusts would not be interfered with by the courts before the day of final accounting arrived. Indeed, such an accounting would be a monumental task because an actuary testified that the corpus of the five trusts for one thousand years alone would be "nine million, nine hundred eighty-eight thousand, three hundred and eighty million billions."

Although the Commissioner assigned as one of his reasons for assessing the additional tax his conclusion that these trusts were "void ab initio by reason of the period of accumulations provided for in the trust instruments," i. e., from 500 to 1,000 years, this appeal presents only the question to be presently resolved, namely, whether plaintiff-taxpayer retained such substantial ownership and control over the property of the trusts that the income therefrom was properly taxable to him. The answer must be found in the trust instruments themselves and in the actions of the settlor and the trustees in the actual administration of the trusts and the handling of the assets therein.

The terms of the trusts varied considerably. The significant features of each are as follows:

Exhibit C: The trust agreement recites that it was executed in 1936, though it is witnessed as of 1938. The trustee, Janet Holden, plaintiff's daughter (Janet Holden Adams after her marriage) was given power to invest without restriction until 1955, and to loan trust funds at interest. Income was to be paid equally to plaintiff's wife and to his father's great-grandchildren until the death of the survivor of Haldis and Hildred Holden, daughters of plaintiff, when the corpus was to be transferred to a Pennsylvania bank as successor trustee. The successor trustee was to pay one-tenth of one per-

cent of the income of the trust multiplied by the number of years which had elapsed since 1936, but not in excess of $200,000 in any year, to Hartwick College until 2936, when the corpus and accumulation was to be paid to the State of Pennsylvania.

The trustee was given the right to appoint a substitute trustee until Haldis and Hildred should die, subject to plaintiff's paramount right to make such an appointment. Plaintiff reserved the right to vary the proportions in which the great-grandchildren might take, to exclude any such beneficiary, to name as income beneficiaries any descendants of great-grandchildren, and to substitute as residuary beneficiary any other charity or governmental unit.

Exhibit 4: This trust agreement is similar to Exhibit C, except it was witnessed in 1936 and plaintiff did not reserve the right to modify the provisions as to beneficiaries.

Exhibit N: The agreement states that it was made in 1936. Janet Holden [Adams] is trustee, with powers as in Exhibit C. Income is to be applied for the benefit of Hildred during her minority and thereafter, subject to plaintiff's reserved right to vary the shares of income among the income beneficiaries, except his wife, who are Hildred and the great-grandchildren of plaintiff's father. Otherwise, the trust is like Exhibit C, though plaintiff reserved no right to substitute residuary beneficiaries.

Exhibit 7: The agreement states that it was made in 1940. Maxwell MacPherson, plaintiff's son-in-law, as trustee, is directed, during the lives of Cyrus and Pamela Holdeen and of any unborn grandchild of plaintiff then in being, to pay the net income to the mothers of minor descendants of plaintiff, other than sons and daughters, with certain variations as to accumulation during the minority of such a descendant. The remainder is to be administered by a Pennsylvania bank which is to pay one one-thousandth of the income, multiplied by the number of years elapsed since 1940 until 2340, and thereafter one-tenth of

the sum so calculated, to Talladega College, "and pay the remainder thereof and in the year 2940, the principal" to the State of Pennsylvania. Plaintiff reserved the right to change the income beneficiary provisions during the measuring lives, excluding himself, his wife, and dependents, and reserved the right to substitute new trustees. He also reserved the right to substitute charitable or public residuary beneficiaries.

Exhibit 8: This trust is like Exhibit 7, except that Audrey Naylor, plaintiff's daughter, is named as trustee and a different college is a residuary income beneficiary.

Exhibit 5: This trust, known as 44–10, was made in 1944, with plaintiff and two of his children, Janet Adams and Randal Holden, as trustees. The income beneficiary, which was to be paid one five-hundredths part of the income, multiplied by the number of years elapsed since 1944, plus other income not lawfully subject to accumulation, is the American Unitarian Association. The trustees have the right to substitute other charities, subject to plaintiff's reserved right to do so. Plaintiff also reserved the right to modify the terms of the trust, but not to name a non-charitable beneficiary.

Exhibit 6: This trust, known as 45–10, states that it was established on June 2, 1945, with Janet Adams and Randal Holden as trustees. The income beneficiary is to be paid as in Exhibit 5 until 2444, when the corpus and accumulation is to be paid to the State of Pennsylvania. The American Unitarian Association or such charity or charities as it or its successor may designate are beneficiaries. The trustees are given the right to pay up to one-half of the income in any year, disregarding the formula. The agreement purports to incorporate and consolidate with its assets those of Exhibit 5, which is to be deemed modified accordingly. Plaintiff reserved no powers whatsoever.

In reaching its decision, the trial court relied in part on Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed.

788, wherein the Supreme Court stated the doctrine that the grantor of a trust might sometimes be treated as the owner of the corpus for income tax purposes, "And where the grantor is the trustee and the beneficiaries are members of his family group, special scrutiny of the arrangement is necessary lest what is in reality but one economic unit be multiplied into two or more by devices which, though valid under state law, are not conclusive so far as § 22(a) is concerned." 309 U.S. at page 335, 60 S.Ct. at page 556. Speaking of Exhibit 6, the trial court said that "The record is devoid of any affirmative evidence by the plaintiff which would sustain his burden as to this particular document. The 'special scrutiny,' required by the Clifford doctrine, shows no effective diminution of control of the corpus involved. The trust was but one more split of the economic unit within an unusually intimate family group." He then adopted the jury's findings as to the first six trusts and set aside its finding in favor of plaintiff as to Exhibit 6, granting the government's motion for a directed verdict and dismissing the complaint.

The trial court held that "evidence of loans, investments and sales" might be considered as evidence of direct benefit to plaintiff, and said that "The manipulation of the corpus by the settlor also indirectly benefits him in that an increase thereof adds to stature as a benefactor." D.C., 166 F.Supp. at page 700. There was, however, no evidence that plaintiff borrowed any part of the corpus of Exhibit 6, and investments and sales which he may have suggested to the trustees were of no more benefit to him than they would have been had he been himself the sole trustee. As for the trial court's finding of benefit to plaintiff in his increased stature as a benefactor, such a doctrine would penalize any grantor who was himself the trustee of a charitable trust, or perhaps of any trust, since the better he managed to increase the corpus for others the more likely might his success be found to cause him to be personally liable for a tax on such gains.

The trial court charged that plaintiff had the burden of proving that the taxes which he sought to recover had been erroneously assessed against him. In answering the submitted question "No" as to Exhibit 6, the jury impliedly found that plaintiff had sustained this burden. The trial court, setting aside the jury's finding and granting defendant's motion for a directed verdict as to that trust, noted that "the principal weakness in plaintiff's case is the total lack of explanation or refutation of those facts and circumstances which point directly to parental pressure and control." D.C., 166 F.Supp. at page 700. Plaintiff did not deny that he had influence over the trustees' investment policies, but correctly argued that such influence could amount to no more than his being a *de facto* trustee, and that a grantor's being sole trustee of a trust is not enough to make its income taxable to him. It is difficult to conceive of what better evidence plaintiff could have produced to prove that he was wrongly taxed as to Exhibit 6. Both of the trustees testified that the American Unitarian Association had received payment of "expendable income" in accordance with the terms of the trust. The fact that plaintiff may have borrowed some trust funds from some of the trustees of some of the trusts without interest or collateral is not proof that he so borrowed the corpus of Exhibit 6. The trial court in setting aside the jury's verdict as to the Exhibit 6 trust was understandably influenced by his belief that the settlor would not have acted differently as to this trust than as to the preceding trusts. This hypothesis, however, would mean that the settlor could never escape the personal income tax burden regardless of how he phrased his trust instruments and abstained from exercising control. In short, the trial court is saying that the propensity to control, once it has attached to a settlor by reason of retention through the trust instruments themselves or by his actions, must always be read into future trusts

even though their terms do not actually or inferentially show retention of control. Exhibit 6 contains none of the elements which would bring it within the Helvering-Clifford doctrine. No member of the settlor's family was a beneficiary of any part of the income or of the corpus. The charity was the American Unitarian Association or its designee. This complete absence of control in the instrument itself, together with the jury's finding that upon all the facts the settlor did not possess such control as to be considered substantially the owner of this property, places it in quite a different category from the others. It was, therefore, error for the trial court to set the jury's finding aside as to Exhibit 6.

As to the other trusts involved in the litigation, there was ample evidence that plaintiff's family was unusually intimate, so that the mere fact that many of the income beneficiaries were relatively distant relatives of plaintiff, i. e., great-grandchildren of his father, does not necessarily remove them from the family unit theory of the Clifford case, though the more distant the relationship the less weight should be given to that factor. It is also clear from the terms of the other trusts that plaintiff retained some significant powers over the disposition of the corpus and income thereof. As to Exhibits C, 4, N, 7, 8, and 5, plaintiff reserved the right to change the beneficiary provisions in some respects. Although he did not reserve such a right as to Exhibit 4, the immediate income beneficiaries thereunder were plaintiff's wife and his father's great-grandchildren, and plaintiff did reserve the right to appoint a substitute trustee, not excluding himself, so that the trust was closer to that in Clifford than was Exhibit 6. As to Exhibit 5, which was purely charitable, plaintiff was one of three trustees, and reserved the right to substitute charitable beneficiaries and to modify the terms of the trust, but not to name a non-charitable beneficiary.

Since there was substantial evidence that plaintiff was advising the trustees as to the management of the trust properties; that he, rather than the trustees, controlled the investment of the trust assets; that he directed and arranged for the transfer of assets from one trust to another; that the trustees were virtually pawns in his financial chess game; and that the trustees loaned money to him and to one another, either as individuals or as trustees, without interest or collateral, the jury was justified in finding that plaintiff had failed to sustain his burden as to the trusts other than Exhibit 6. The terms of the trusts and all the circumstances of their creation and operation might reasonably be found to establish that plaintiff enjoyed control over and benefit from the properties to such an extent that he should be regarded as the owner thereof for purposes of income taxation. It was not error for the trial judge to deny plaintiff's motion to set aside the jury's findings as to those trusts, and his direction of a verdict in favor of defendants as to trusts, Exhibits C, 4, N, 7, 8 and 5 was proper.

The claim is made that the assets of the trust (Exhibit 5) were merged into the trust (Exhibit 6). The Exhibit 6 trust was in force for only about seven months in 1945. The trial court did not decide whether a consolidation of the two trusts was legally accomplished. For this reason, this issue remains to be decided. If the facts disclose that the Exhibit 5 trust was merged with the Exhibit 6 trust as stated in the letter, then its assets became a part of this trust and should be considered as governed by its terms. The judgment appealed from must, therefore, be vacated and a new judgment entered after the merger question has been decided upon the facts in accordance with this opinion. The question of the validity of any of the trusts herein involved, because of the duration of the accumulations provided for, is not before this Court on this appeal, and, therefore, no opinion is expressed on this subject.

SWAN, Circuit Judge (dissenting in part).

I agree with so much of my brother's opinion as holds that plaintiff was wrongly taxed as to the trust referred to as Exhibit 6, and that the judgment should be vacated and the cause remanded. I agree also that on remand the trial court should decide "whether a consolidation of the two trusts [Exhibit 5 and Exhibit 6] was legally accomplished."[1] Apparently my brothers hold that this is the only issue to be considered on remand and that the special verdicts of the jury as to the remaining five trusts shall be allowed to stand and "a new judgment entered after the merger question has been decided upon the facts in accordance with this opinion." With this part of the opinion I am unable to agree.

The question of fact submitted to the jury with respect to each of the trusts was: "Did Jonathan Holdeen possess such control over the property of the trusts mentioned below so that he be considered as substantially the owner of the trust properties for income tax purposes." In a lengthy charge the jury was told that this was a "simple question," that there were no disputed facts, that "The only thing, if there is any dispute, and it is a very narrow issue, is the inference that may be drawn from those facts." The jury was told to turn first to the written documents "and see what powers the plaintiff here retained in these written documents." By way of illustration the court referred to Exhibit C in which the trustor reserved the right to substitute a trustee. The jury was told that under this reservation he might substitute himself as the trustee; that the Government contends this was an indicia of ownership, but the plaintiff contends no such inference may be drawn because a settlor may validly make himself trustee of his own trust. No instruction was given to assist the jury to determine which contention to adopt. Similarly, as to the reservation of a right to increase or decrease the shares of income of the grandchildren beneficiaries the jury was told of the conflicting claims of the parties, but without instruction as to which was correct. When the judge turned to the acts and writings outside the trust instruments themselves, he likewise stated the conflicting contentions of the parties but gave no adequate instructions to enable the jury to choose intelligently between them. That the jury found the charge confusing is demonstrated by the long colloquy between Juror No. 5 and the court when the jury, after several hours of deliberation, returned to the courtroom and asked the court to answer several questions which were troubling them. Appellant's Appendix, pp. 116a–131a. In my opinion the charge was of so little assistance to the jury that its answers to the question submitted should be disregarded and a new trial ordered as to each of the trusts.

---

1. However, the relevance of such a decision seems doubtful if the statement in appellant's Reply Brief is correct, namely, that the Exhibit 5 trust was not claimed by the Commissioner to have had any 1945 income and no income from it was included in his determination of deficiency.